# EXHIBIT 8

```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
 2

 3   --------------------------------------X
                                          :
 4   YVES SAINT LAURENT PARFUMS, S.A.,    : 07-CV-3214
       et al.,                            :
 5                                        :
                             Plaintiffs   :
 6               v.                       :
                                          : September 21, 2007
 7   COSTCO WHOLESALE CORPORATION,        :
                                          : 500 Pearl Street
 8                       Defendant.       : New York, New York
     --------------------------------------X
 9

10        TRANSCRIPT OF CIVIL CAUSE FOR HEARING ON DISCOVERY
                      DISPUTES AND SCHEDULING
11           BEFORE THE HONORABLE HENRY P. PITMAN
                UNITED STATES MAGISTRATE JUDGE
12

13

14   APPEARANCES:

15   For the Plaintiffs:        LOUIS SHERMAN EDERER, ESQ.
                                JOHN MALTBIE, ESQ.
16                              Arnold & Porter, LLP
                                399 Park Avenue
17                              New York, New York  10022

18   For the Defendant:         JAMES WILSON DABNEY, ESQ.
                                DARCY GODDARD, ESQ.
19                              Fried, Frank, Harris, Shriver &
                                  Jacobson
20                              One New York Plaza
                                New York, New York  10011
21

22   Court Transcriber:         RUTH ANN HAGER
                                TypeWrite Word Processing Service
23                              356 Eltingville Boulevard
                                Staten Island, New York 10312
24

25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

2

```
 1          THE CLERK:  Yves Saint Laurent v. Costco Wholesale.

 2          Please state your names for the record.

 3          MR. EDERER:  Louis Ederer and John Maltbie from

 4  Arnold & Porter on behalf of the plaintiffs.

 5          MR. DABNEY:  James W. Dabney and Darcy M. Goddard

 6  for defendant, Costco Wholesale Corp.

 7          THE COURT:  Good afternoon.  We're here today to

 8  resolve -- hopefully resolve some scheduling disputes -- or

 9  some discovery disputes and there's also a scheduling issue.

10          I have three letters framing a dispute.  I have a

11  letter from Arnold & Porter dated August 30, a letter from

12  Fried, Frank dated September 10, and a second letter from

13  Arnold & Porter dated September 12.  I take it that's the

14  universe of relevant correspondence.  Is there anything else

15  anyone has submitted?

16          MR. EDERER:  That's it, Your Honor.

17          MR. DABNEY:  Nothing else, Your Honor.

18          THE COURT:  Okay.  All right.  All right.  Let me

19  start by asking plaintiff what exactly is the nature of the

20  goods being sold?  Are they -- do you know yet whether or not

21  they're genuine goods?

22          MR. EDERER:  Your Honor, we don't know for sure if

23  they're genuine.  We don't have any reason to believe that

24  they're counterfeits.  There are three types of goods that we

25  could have here that could constitute infringements.  One
```

3

1  would be straight counterfeits made by somebody that we have

2  no relationship with.  We have no reason to believe that these

3  goods are straight counterfeits.

4        The second type of goods that could be infringements

5  are goods that were put into the stream of commerce without

6  authorization, for example, by one of our licensees who is a

7  rogue, or for example if the goods were stolen.  If goods are

8  introduced into the stream of commerce without our

9  authorization, then even if they're made by somebody we have a

10  relationship with they can be infringements.

11        And the third type would be with respect to the

12  goods being altered at the point where Costco gets ahold of

13  them and, of course, that is what we're talking about here.

14  We do know that Costco has repackaged the goods and we have

15  made claims with respect to that type of infringement, but we

16  have also made a claim with respect to the second type of

17  infringement as well.  We've made an allegation that these

18  goods are being purchased through unauthorized distribution

19  channels and that can clearly encompass the introduction of

20  those goods into those channels in addition to some other

21  diversion along the way.

22        So that's a long-winded answer to your question and

23  I hope I --

24        THE COURT:  All right.  And --

25        MR. EDERER:  The short answer is they're not true

4

1    counterfeits.

2            THE COURT:  Okay.  And the unauthorized sale theory

3    is where in your amended complaint?

4            MR. EDERER:  Well, Your Honor, it is stated in a

5    paragraph.  I believe it's paragraph 18 in the amended

6    complaint.  It is not the subject of a separate cause of

7    action, but it is encompassed within each cause of action.

8            THE COURT:  All right.  Yves Saint Laurent -- I'm

9    just reading paragraph 18 of the amended complaint.  "Yves

10   Saint Laurent has recently discovered that defendant is

11   importing, distributing, advertising, offered for sale, and/or

12   selling in its store locations throughout the United States

13   repackaged Yves Saint Lauren cosmetic and beauty products

14   bearing the YSL marks, including YSL's mascara and lip care

15   products, respectively, the unauthorized lip care products and

16   the unauthorized mascara products and collectively the

17   unauthorized products.  Defendant is not an authorized

18   purchaser or reseller of YSL cosmetics and beauty products and

19   has purchased such products through unauthorized channels of

20   distributions.  Photographs of the unauthorized, et cetera,

21   are annexed as exhibits."

22           All right.  And your theory for getting a seller for

23   obtaining the identity of the seller is -- maybe you want to

24   review those briefly before I hear from Costco.

25           MR. EDERER:  There are several-fold, Your Honor.

5

1   First of all, we think it's encompassed within this allegation

2   which is, in turn, repeated and realleged in each and every

3   one of our causes of action in this complaint.  That's number

4   one.

5           Number two, as we indicate in our letter, we believe

6   it goes to the issue of damages, because to the extent that

7   these goods are coming in from outside the country, one of the

8   plaintiffs, which is the U.S. YSL subsidiary, has suffered a

9   lost sale since it is supposed to be the only party

10  introducing these goods into U.S. commerce.

11          The third thing that we've indicated in our

12  complaint is that the -- and we have copies of some of these

13  documents if you want to see what we're talking about there.

14  There are documents that have been produced, which indicate or

15  which appear to indicate that the goods are coming in from

16  outside the country and we have owned subsidiaries -- wholly

17  owned subsidiaries in several parts of the world.  But in

18  other parts of the world we have parties that we have

19  exclusive distribution agreements with.  If these goods are

20  be -- coming from parties with whom we have exclusive

21  distribution agreements, then even though we don't have a

22  tortious interference claim in the complaint yet, I believe we

23  have the right to explore that based upon the documents that

24  have been produced.

25          And finally, something which we didn't mention in

6

1    our papers, in our letters to you, there's a claim here, and I

2    believe it's encompassed within this complaint, that there is

3    harm to our goodwill in the manner in which these goods are

4    being handled and presented.  These are skin care goods.

5    These are goods that are applied to the skin and they're

6    carefully controlled in terms of how we present them, how we

7    handle them, and how we distribute them.  And I believe we

8    have the right to find out as part of our claim for

9    irreparable harm and for loss of goodwill how these goods have

10    been handled along the way as they make their way to Costco.

11              So that's a nutshell version of the four reasons why

12    we believe that the causes of action and the allegations in

13    the complaint would encompass or allow us to take this

14    discovery.

15              THE COURT:  All right.  Who wants to be heard?

16    Who's going to be heard on behalf of Costco?

17              MR. DABNEY:  Jim Dabney for --

18              THE COURT:  Yeah.

19              MR. DABNEY:  -- Costco Wholesale, Your Honor.

20              THE COURT:  Okay.

21              MR. DABNEY:  Your Honor, the complaint complete with

22    photographs alleges that if you walk into a Costco Wholesale

23    store you would encounter a product that is packaged, such as

24    the sample I'm holding in my hand, and the allegation is that

25    Costco's offering of this item for sale is likely to cause

7

1    confusion or delusion or other affects that the law makes

2    actionable.

3         Now, the capacity of this item to cause confusion,

4    we would respectfully submit, is not affected at all by the

5    name of the driver of the truck that might have brought the

6    product to Costco, the name of the owner of the truck that

7    carried the product to Costco, the name and owner of the

8    warehouse where the product might have landed and been stored

9    before it was trucked to Costco, or the name and address of

10   any one or more of the distributors through whose hands the

11   product may have passed en route to the warehouse to the truck

12   to Costco.  None of those facts we --

13         THE COURT:  Let me -- well, are you familiar with

14   Judge Haight's decision in <u>Ryan v. Volpone Stamp Company</u>?

15         MR. DABNEY:  I can't say from memory I'm familiar

16   with the case.

17         THE COURT:  Okay.  No, I -- yeah.  I mean --

18         MR. DABNEY:  But --

19         THE COURT:  -- just in the course of preparing for

20   today I was doing a little quick research.  I mean, Judge --

21   in the <u>Ryan</u> case, Judge Haight wrote the following.  "A court

22   faced" -- and this is <u>Ryan v. Volpone</u>, 107 F. Supp. 2d 369 at

23   382, Southern District 2000.

24         "A court faced with an infringement claim for

25   unauthorized sale of the trademark product must perform a two-

8

1    part test analysis.  First, the Court must consider whether

2    the trademark owner authorized the first sale of the goods.

3    Second, the Court must consider whether the goods were

4    genuine.  If the initial sale was authorized, the Court must

5    undertake the second part of the analysis and determine

6    whether as a matter of fact the goods were later" -- I'm

7    sorry.  Let me read that sentence again.  "If the initial sale

8    was authorized, the Court must undertake the second part of

9    the analysis and determine whether as a matter of fact the

10   goods, which were later resold without authorization, were

11   genuine.  If the goods were genuine there is no violation of

12   the Lanham Act dispute the fact that the goods were sold

13   without the trademark owner's consent unless the plaintiff can

14   establish consumer confusion as to sponsorship as described by

15   the Second Circuit's decision in H. L. Hayden.  If the goods

16   were not genuine, that is, altered or not in keeping with the

17   trademark owner's quality standard, a valid claim for

18   trademark infringement is established.  If the trademark owner

19   did not approve the original sale, the goods cannot be

20   considered genuine as a matter of law and infringement is

21   established."

22           Doesn't that seem to suggest that the conditions --

23   that the nature of the initial sale is relevant to the

24   infringement inquiry?

25           MR. DABNEY:  Your Honor, if the complaint in this

9

1  case had alleged anywhere that regardless of any packaging

2  that Costco used, the sale of an unpackaged product, such as

3  the example I have in my hand, would infringe our rights,

4  because the first sale of it was not authorized by us, that

5  would have been a totaling different case.  And we would not

6  have the case we have or the schedule we have or the discovery

7  we've had in this case up until now, so I'm not disputing that

8  there might possibly be a claim possible that they could have

9  alleged.  They cite the Liz Claiborne case, for example, in

10 which a trademark owner sued its contract manufacturer for

11 having sold goods overruns and stuff.

12        So, yes, there is the theoretical possibility such a

13 claim might have been alleged in this case, but as Your Honor

14 very aptly pointed out, this complaint doesn't allege such a

15 claim.  The letter of September 12th, the reply letter that --

16        THE COURT:  Well --

17        MR. DABNEY:  -- came in, they say in the third

18 paragraph on the first page that they need this discovery "in

19 order to support its claim that the first sale of the goods at

20 issue was not authorized."  There is not any allegation in

21 this complaint that says the first sale was not authorized.

22 That was not anything we had notice of.  That wasn't what we

23 understood this case was about.  We agreed to a discovery

24 schedule in this case.  It called for the plaintiff to give us

25 its export reports last Friday and all discovery to be over on

10

1  October 31 because all you needed to know about this case was

2  basically what I'm holding in my hand, if this packaging

3  likely to cause confusion with regard to its contents.  If the

4  plaintiff had alleged -- we have sophisticated counsel on the

5  other side.  If they said that no matter what packaging we

6  use, no matter what disclaimer notices were used the sale of

7  these goods per se infringes our rights because they were

8  stolen or because we didn't authorize their first sale, they

9  knew how to plead such a claim as that.  They didn't plead it.

10  We couldn't test such a claim by motion in this case because

11  Mr. Ederer had just said they haven't alleged it.  There is no

12  such claim in this case.

13         What's going on here is a purported claim seeking

14  damages for the sale of 964 units of lipstick is being used as

15  a purported basis of vehicle for seeking broad discovery of

16  Costco's sources.  This is not what this discovery application

17  is about.  It's not to try to prepare to prove up the claim

18  that's pleaded.  It's attempt to use this litigation to find

19  out other information and to place it in the hands of an agent

20  whose job it is to act on it.  And can --

21         THE COURT:  Well, let me -- I mean, paragraph 18 of

22  the amended complaint alleges that "Defendant is not an

23  authorized purchaser or reseller of YSL cosmetic and beauty

24  products and has purchased such products through unauthorized

25  channels of distribution."  Why isn't that allegation

11

1    sufficient to allege an unauthorized -- or that the sale of

2    the goods that you're selling -- the initial sale of the goods

3    that Costco is selling was unauthorized?

4          MR. DABNEY:  Because the transactions through which

5    Costco purchased these goods obviously were not authorized by

6    the plaintiff, but that is a totally different allegation from

7    saying the goods were --

8          THE COURT:  Hold on, hold on.  Are you -- you're

9    admitting that Costco obtained the goods through unauthorized

10   sales?

11         MR. DABNEY:  "Unauthorized" in the sense that the

12   plaintiff had nothing to do with it.  These were purchased in

13   the open market from people having nothing to do with this

14   plaintiff and that's --

15         THE COURT:  Well, if the initial sale was

16   unauthorized, then isn't that infringement?

17         MR. DABNEY:  They don't say in here the initial sale

18   was unauthorized.  They could have easily said that.  They

19   didn't say that.  They have no basis for alleging that.

20   They're trying to put the fort before the horse -- the cart

21   before the horse.  They have not put in one allegation.  They

22   have not said they have --

23         THE COURT:  No, but they do allege that it was

24   purchased through "unauthorized channels of distribution."

25         MR. DABNEY:  Your Honor, that could describe our

1  purchase from a next door neighbor.  That doesn't put Costco

2  on notice of a theory that this plaintiff is saying that they

3  have a claim that no matter what packaging we use, the mere

4  offering of this product somehow infringes rights of this

5  plaintiff because the first sale was unauthorized.  If that

6  was the theory --

7          THE COURT:  No, but that -- look.  I mean, that I'm

8  not sure is the issue.  I mean, the issue here is whether or

9  not the discovery sought is relevant to the claims in the

10  complaint as fairly read.

11          MR. DABNEY:  Exactly.

12          THE COURT:  So --

13          MR. DABNEY:  And the --

14          THE COURT:  I mean, I'm not sure that can be read to

15  exclude an unauthorized initial sale.

16          MR. DABNEY:  Your Honor, the claim for relief in the

17  case, the exhibits attached to the complaint with the

18  photograph certainly what we understood -- what we understood

19  from day one was that this was a complaint about the

20  packaging.  We haven't sought any discovery of the plaintiffs

21  of any possible theory that the first sale of these goods was

22  unauthorized.  We have not --

23          THE COURT:  No, but that -- I'm not sure that's the

24  right question to ask, though.  I mean, if the discovery

25  sought is relevant to the claims as fairly read -- as fairly

13

1   read by the Court -- the fact that you may have read them

2   differently, how is that controlling as to what discovery

3   they're entitled to?

4             MR. DABNEY:  Your Honor, I would say that counsel's

5   September 12th letter makes perfectly clear that if it had

6   been the plaintiff's intent to plead a theory that packaging

7   or no packaging there's an infringement because the first sale

8   of the goods was not authorized, they knew how to plead that.

9   They didn't.

10            THE COURT:  Okay.  And what in this -- I think you

11  just referred to Arnold & Porter's September 12th letter.

12            MR. DABNEY:  Yes, the third --

13            THE COURT:  What --

14            MR. DABNEY:  -- paragraph of the first page.

15            THE COURT:  Okay.  One -- let me take a look at

16  that.  And it's paragraph beginning in its September 10

17  letter?

18            MR. DABNEY:  Yes.

19            THE COURT:  Okay.

20            MR. DABNEY:  It says --

21            THE COURT:  "In its September 10 letter, however,

22  Costco completely misstates YSL's position.  Rather than

23  acknowledging that YSL says it needs supplier information in

24  order to support its claim that the first sale of goods at

25  issue was not authorized, Costco characterizes YSL's claim as

14

1  one for unauthorized diversion of goods after the first sale

2  was concluded.  Accordingly, says Costco, supplier information

3  is not needed since the diversion of goods following an

4  authorized first sale is not infringement.  That is not,

5  however, what YSL is alleging and clearly not what Costco

6  understood YSL to be alleging when Costco interposed its first

7  sale defense."

8        I'm not sure I understand how that paragraph

9  supports your argument.

10        MR. DABNEY:  There's nothing in their complaint that

11  says in words or substance the first sale was not authorized.

12  They don't use the word "first sale."  That was not a theory

13  they ever put out.  What they say is --

14        THE COURT:  No, but I think we're past magic

15  language pleading, though.  I mean, they say "unauthorized

16  channels of distribution."

17        MR. DABNEY:  Of course the channels of

18  distribution -- there is a large world market that they don't

19  control.  "Channels of distribution" does not fairly place a

20  defendant on notice that what he's really saying is regardless

21  of the channels of distribution through which he purchased

22  them, those channels could be perfectly lawful, but the first

23  sale by us was not authorized and that, therefore, no matter

24  what the channels of distribution you purchased them through,

25  we have a claim.  There's no such claim in this case.

15

1          THE COURT:  Well --

2          MR. DABNEY:  They know how to plead it --

3          THE COURT:  Well --

4          MR. EDERER:  Your Honor --

5          MR. DABNEY:  -- they didn't.

6          MR. EDERER:  Your Honor --

7          THE COURT:  Well, tell you what.  Let -- I'm sorry.

8  I can't read your hand -- I'm sorry, you're Mr. Dabney?

9          MR. DABNEY:  Dabney.  Yes.

10          THE COURT:  Let Mr. Dabney finish.

11          MR. DABNEY:  Sorry.

12          THE COURT:  Go ahead.  Go ahead.  But I mean,

13  wouldn't the channels of distribution encompass the first

14  sale?

15          MR. DABNEY:  You know, I think if you read the

16  complaint as a whole and look at all of the allegations in

17  which they say the packaging is down scale, and the packaging

18  is misleading, and the packaging -- they wouldn't have to --

19  they don't -- they don't make a single claim in this complaint

20  that the sale of goods, per se, is infringing.  That is a

21  theory that emerged in the process of discovery as they tried

22  to justify discovery of information that had nothing to do

23  with whether the packaging was misleading or not.  It would

24  have been so easy for them.

25          Your Honor, if they think they have a basis for

16

1  accusing Costco of infringement because packaging or no

2  packaging this product was stolen or was unauthorized or

3  something, they can file that complaint tomorrow.  And we can

4  have a lawsuit on that in which that will be the issue fairly

5  joined and we can test it by motion.

6           It's totally unfair to have a complaint that says

7  the packaging is deceptive that asserts no claim that the

8  goods, per se, are anything other than authentic genuine goods

9  than to say, okay, so we don't want to plead that, because we

10 don't have a basis for alleging it --

11          THE COURT:  Does the complaint --

12          MR. DABNEY:  -- so we can't test it.

13          THE COURT:  Does the complaint allege that the goods

14 are genuine authorized goods?

15          MR. DABNEY:  The complaint says that --

16          THE COURT:  What does it say about the goods?

17          MR. DABNEY:  -- our conduct is likely to cause

18 confusion.  That's what the --

19          THE COURT:  Does -- what -- what does it say about

20 whether the goods are authorized or unauthorized?  I don't

21 recall --

22          MR. DABNEY:  The complaint is silent on that, Your

23 Honor.

24          THE COURT:  All right.

25          MR. DABNEY:  But it's the plaintiff's burden as a

17

1    pleader to say that the mark on this box is false, that the

2    packaging is false.  It's the plaintiff's burden to plead

3    that.  They haven't pleaded that and the reason they haven't

4    pleaded that is they have no basis for alleging that.

5              MR. EDERER:  Your Honor, may I?

6              THE COURT:  Anything else you want to tell me?

7              MR. DABNEY:  I'm sorry?

8              THE COURT:  Is there anything else you want to tell

9    me before I hear from Mr. Ederer?

10              MR. DABNEY:  I would just say a couple of things.

11              THE COURT:  Um-hum.

12              MR. DABNEY:  First of all, I can tell, Your Honor,

13    we, I believe, reasonably understood this complaint as only

14    dealing with the packaging, number one.

15              Number two, a denial of this application would leave

16    the plaintiff perfectly free to file a claim that's squarely

17    and forthrightly puts out this new theory that regardless of

18    what the packaging is, the goods are infringed because they're

19    stolen or, you know, whatever the theory might  be.  And if

20    they plead such a claim, we'll have the opportunity to move

21    against it by a motion and test whether or not that's a viable

22    legal theory or not.

23              But in a case that is in court because of an

24    allegation that packaging is deceptive and nowhere alleges

25    that the goods -- the first sale of the goods was

18

1   unauthorized, it's totally unfair to expose Costco to the kind

2   of injury that we're prepared to demonstrate we would suffer

3   if we turned over this information.

4          And finally, I would point out, that if -- in cases

5   that involve trade secrets where you're going to turn over

6   information to some representative of an opponent, in my

7   experience that requires that a person who's going to get it

8   be somebody who has no other connection with the litigant will

9   undertake that they will do no more work for like five years,

10   so there's no possibility that the information could influence

11   any act that they may be called upon to do --

12          THE COURT:  Well, it depends on the nature of the

13   trade secret.  If it's Pepsi in the formula for Coca-Cola is

14   one thing, but I'm not sure --

15          MR. DABNEY:  What we're talking --

16          THE COURT:  I'm not sure that the plaintiff here is

17   going to compete for your source is a competitor with respect

18   to your source.

19          MR. DABNEY:  It is impossible for someone who's job

20   it is to interdict so-called unauthorized sales of genuine

21   goods.  And by the way, the plaintiff would be unhappy about

22   Costco sale of these goods no matter how genuine they were.

23   Let's be frank.  So it's a situation which the information is

24   being sought to be placed in the hands of the plaintiff's

25   agent whose very job it is to act on it puts a person in an

19

1   untenable position, and I'm an agent of the plaintiff and I

2   know this information that the plaintiff has an avowed

3   commercial interest from acting on it, but I can't do my job

4   because of a protective order.  It's just not the kind of

5   situation in which trade secret information can properly be

6   given over and in this case there's no need for it.  They can

7   file a new complaint if they have one.  They haven't asserted

8   one.

9           THE COURT:  Let me just -- before I heard from

10  Mr. Ederer, I'm just -- just paragraph 18 again, I just have

11  one question.  I guess one question for you.

12          Paragraph 18 reads, "YSL has recently discovered

13  that defendant is importing, distributing, advertising,

14  offering for sale, and/or selling in its store location

15  throughout the United States repackaged Yves Saint Laurent

16  cosmetic and beauty products bearing the YSL marks including

17  YSL's mascara and lip care products (respectively the

18  unauthorized lip care products and the unauthorized mascara

19  products and collectively the unauthorized products)."

20          The fact that plaintiff is referring to the products

21  as the unauthorized products that that -- does that have any

22  meaning for you in terms of whether or not they're claiming

23  their first sale was not authorized?

24          MR. DABNEY:  Yes, the key word is "repackaged" in

25  the third line.  Repackaged.  And if you go back to the

20

1  preceding page, Your Honor, paragraph 14 makes clear what the
2  context of this allegation is.

3          THE COURT:  In paragraph 14, "YSL sells its line of
4  cosmetics and beauty products including products bearing YSL
5  marks only in company-owned stores and select duty-free
6  boutiques, and in certain high-end department specialty
7  stores, including Bloomingdale's, Neiman Marcus, and Saks
8  Fifth Avenue.  YSL does not sell such products to off-price
9  retail chain such as defendant."

10         MR. DABNEY:  Exactly.

11         THE COURT:  Yeah.  Okay.

12         MR. DABNEY:  So therefore, of course, we're not an
13  authorized distributor.  We must have purchased them from what
14  the plaintiffs would call unauthorized channels of
15  distribution.  That is a country mile away from saying we, the
16  plaintiff, didn't authorize the first sale of the goods.  If
17  we bought these goods from Bloomingdale's, for example, they
18  would say that's an unauthorized sale, even though the initial
19  sale to Bloomingdale's was fully authorized by them.

20         The complaint does not fairly allege or place us on
21  notice that they are alleging the theory that these goods are
22  stolen or that they didn't authorize the first sale.  If they
23  have a basis for pleading it, they can file a complaint
24  tomorrow so alleging it.  They have not done it in this case.
25  We're prepared to -- summary judgment motions are due in this

1  case on November 15th.  Discovery is supposed to be over on

2  October 31.  We want this dispute over -- the packaging over

3  with.  If plaintiff wants to start a whole new claim that says

4  "packaging or no packaging these goods are not authorized and

5  therefore we have a right to relief" let them file that

6  complaint.  They haven't done it in this case.

7              THE COURT:  All right.  Mr. Ederer, reply.

8              MR. EDERER:  Your Honor, I just heard Mr. Dabney say

9  that -- I lost count actually -- at least a dozen times that

10  the original complaint does not fairly give Costco notice that

11  we are claiming that these goods could be or are goods that

12  were not authorized to be introduced into the stream of

13  commerce at the first sale level.  I am holding in my hand the

14  answer of Costco to the complaint in this case filed on --

15             THE COURT:  That's the answer to the original

16  complaint?

17             MR. EDERER:  Answer to the original complaint filed

18  on May 24, 2007.  First affirmative defense.  "To the extent

19  that the first sale doctrine is an affirmative defense" --

20             THE COURT:  Right, but my understanding is that

21  there is an amended complaint filed and Costco is no longer

22  asserting first sale in response to the amended complaint.

23             MR. EDERER:  Correct, but you have to look and see

24  what they're set -- first of all, the issue of whether they

25  were on notice from our original complaint or from our amended

22

 1  complaint as to whether or not we're making this claim.

 2  Clearly, they were on notice.  We didn't call Mr. Dabney and

 3  say, you'd better put in an affirmative defense in here based

 4  on the first sale doctrine.  That defense goes to the question

 5  of whether the goods were introduced into the stream of

 6  commerce without authorization.  That's the only reason why

 7  you would include a defense like that in here.

 8          And if you look at Mr. Dabney's explanation in his

 9  September 10 letter to Your Honor as to why they removed that

10  affirmative defense from the amended answer, his explanation

11  is that at the time the first answer was served Costco was

12  uncertain whether its sale of genuine goods was properly

13  described as rightful in first sale terms.  Costco has since

14  satisfied itself that the first sale doctrine is not properly

15  considered an affirmative defense in a case such as this one

16  and has so omitted any such defense from its answer.

17          What they're saying is not that the issue of whether

18  the first sale doctrine -- that's not -- they're not saying

19  that that's out of the case.  What they're saying is it's a

20  question of whose burden it is to prove that.  They have now

21  satisfied themselves and they cite a case, <u>Tailor Made Golf v.</u>

22  <u>MJT</u> in their letter to you.  They have satisfied themselves

23  and if you read that case that case suggests that the first

24  sale doctrine may be something that a plaintiff has to

25  affirmative prove as opposed to a defendant proving by way of

23

1  an affirmative defense.

2        This doesn't say that the issue of the first sale

3  doctrine is out of the case.  What they're saying is we don't

4  have to put it in as an affirmative defense because you,

5  plaintiff, has to prove it.  But this business about whether

6  or not Costco had any idea or were fairly on notice as to

7  whether or not we were making a first sale claim, I think all

8  you have to do is look at two lines, about 12 words from their

9  initial answer.  They clearly understood this.  It's the best

10  evidence that they understood it and they understood it from

11  day one.

12        I heard Mr. Dabney use the words "from day one we

13  never knew this."  From day one they knew exactly what this

14  was about, and that's why they put this defense in here.

15        Now, the other thing I'd like to briefly address,

16  Your Honor, is this issue of whether this is the kind of trade

17  secret that would require total exclusion of this evidence.

18  Your Honor is exactly right.  This is not the Coca-Cola

19  formula.  The cases that they cite to you where -- and by the

20  way, they say to you and they say -- they said to Judge Sand

21  that I, Louis Ederer from Arnold & Porter, cannot be trusted

22  with this information because I'm the outside trademark

23  counsel.  And as soon as I get this information, I'm going to

24  run to my computer and type up a cease and desist letter to

25  these distributors or suppliers of theirs.  Okay.

24

1          This proposed order that we crafted, the protective

2     order that we crafted, it does not allow me to do that.  It

3     doesn't allow in-house counsel to do that.  Everybody has to

4     sign -- we crafted a protective order deliberately to cover

5     this issue because the first conversation I ever had with

6     Mr. Dabney -- I never met him before -- he calls me up and he

7     says, "You know we're going to have a problem giving you

8     supplier information."  And I said, "Well, let's put that

9     right into the case management conference before Judge Sand in

10    July because I want to get that issue resolved right up

11    front."  And he said, "No, no, let's not put that in the

12    proposed case management order.  We'll deal with that and

13    we'll try to craft a protective order that covers that

14    situation."

15         And we did.  We crafted a protective order that's

16    much more restrictive than any protective order that you would

17    ordinarily introduce.  Okay.  Mr. Dabney framed this issue

18    from day one.  Okay.  But what they're saying is this is so

19    hard -- that I can't be trusted in this situation because I'm

20    going to go run out there and send a cease and desist letter

21    or somehow otherwise harass these people.

22         The cases that say that outside counsel or inside

23    counsel can't be trusted with information like this are cases

24    where as Your Honor said we're talking about a formula or an

25    invention or a patent or something like that.

1          I had a case not too long ago where my firm was

2   handling a patent case.  It was a trade secret infringement

3   litigation and we also had a patent application that was

4   pending for our technology at the same time.  And the issue

5   was whether my firm could receive the information about the

6   defendant's invention and also prosecute our patent

7   application.  And the issue was whether or not the lawyers who

8   were handling the patent application might take the

9   information that we get in the lawsuit and then use it to

10  craft the patent application to try to exclude the defendant's

11  invention from coming out on the market.

12          That's not what this case is about.  We're talking

13  about distributors.  Trademark cases every day of the week.

14  I've never been involved in a trademark infringement

15  litigation where supplier information was not provided.  I've

16  been in many cases where the defendant didn't want to give

17  supplier information, but I've never been involved in a case

18  where the supplier information was not ordered to be given.

19  It's not the kind of information that can be excluded.

20          And if there's a violation everyone is going to be

21  in contempt of court.  I'm going to be in contempt of court,

22  my in-house counsel in Paris is going to be in contempt of

23  court, and so is everybody else.  But that's why you have a

24  protective order.  You craft it and you make it --

25          THE COURT:  Well, let me ask you this.  Why does the

26

1   in-house counsel need to see supply -- does the in-house

2   counsel need to see supplier information?

3          MR. EDERER:  Well, how am I supposed to know where

4   these goods come from or what the information is if I can't

5   even ask anybody of my client who these people are, whether

6   this is an authorized supplier or not an authorized supplier.

7          THE COURT:  Well, I mean, doesn't your client have a

8   list of who the authorized suppliers are?

9          MR. EDERER:  I suspect they do.

10          THE COURT:  Well, I mean, if you get the list of

11   who's authorized and I grant your application to compel

12   discovery here, you can look at Costco's suppliers and you can

13   look at the authorized suppliers and it's either on ir or not

14   on it.

15          MR. EDERER:  Yeah, I don't know if it's as simple as

16   that, but you might be right, Your Honor.  You might be right,

17   but the point of the matter is that if theirs -- the other

18   part of this is I'm sitting here.  Here it is today.

19   September 21st.  This case was started in May.  I have not

20   been able to discuss this case with my client because I got

21   500 pages of document production in this case and 470 of them

22   were marked "Outside counsel attorney's eyes only."

23          My client keeps saying to me, "How are we doing in

24   the case?" and my response is "I'll let you know as soon as I

25   see Judge Pitman.  Maybe he'll allow me to discuss the case

27

1  with you." We're not talking about military secrets here.

2  This is because this is their business model and they don't

3  want anybody to know how they do their business. There's no

4  competitive advantage for us to be gained by this. It has to

5  do with allegations that were in the complaint in the

6  beginning, which they understood to be in the complaint in the

7  beginning as evidenced by the fact that their first

8  affirmative defense is a first sale doctrine defense.

9        And we have the right -- by the way, I did mention

10 this earlier. In my letter to Judge Sand dated August 30th I

11 pointed this out. The requests -- the information that we

12 sought in our discovery requests, the document requests and

13 the interrogatories, was responsive to their affirmative

14 defense. They put in an affirmative defense in here. We

15 said, well, tell us what you've got in support of the

16 affirmative defense.

17       And so the affirmative defense was still in the case

18 when we served our discovery requests. Now they want to take

19 the affirmative defense out so that it's not an issue anymore,

20 but they're really not taking the affirmative defense out.

21 They're just saying it's our burden to prove it, not their

22 burden to defend it. So this has been in the case since day

23 one. It's exactly the opposite of what Mr. Dabney has been

24 telling you for the last 20 minutes. They clearly knew it.

25       THE COURT: All right. Do you want a very brief

28

 1   response, Mr. Dabney?

 2            MR. DABNEY:  Your Honor, early in my career I dealt

 3   with trans shipping cases and the concept of whether something

 4   was initially authorized.  The first sale would have been a

 5   completely different kind of concept.  I can tell the Court,

 6   since I was the one who wrote it, that how you characterize

 7   whether a dealer ships it wholesale as being lawful because

 8   the goods are genuine or first sale, that's all that was about

 9   and we've since satisfied ourselves that it's not a defense

10   that we need to prove.  It's obviously the plaintiff is making

11   it the centerpiece of its justification for seeking discovery.

12   And so it's just they don't need discovery in order to find

13   out what the basis of the defense is, because we're not

14   asserting it's a defense.  We don't even think it is a

15   defense.

16            I would come back to my initial --

17            THE COURT:  Well, is it an issue in the case?

18            MR. DABNEY:  As far as we're concerned, Your Honor,

19   it is not.  As far as we're concerned, there is nothing in the

20   complaint that makes any legal consequence for it from whether

21   or not the -- remember, the -- if the case is about the

22   truthfulness or the deceptiveness of our packaging, Your Honor

23   has not heard a word of argument that the identity of the

24   distributor through whose hands the goods arrived has anything

25   to do with whether the in-store display and the adequacy of

29

1  the disclaimer notice and the labeling or any of that is

2  likely to cause confusion.

3           So this entire argument this morning has been about

4  a claim that is not -- there's no pictures, there's no claim,

5  there's no description, there's no reference to first sale in

6  the complaint.  It is a wholly new theory of liability in

7  which the plaintiff is now saying, we need discovery to quote

8  them in support of its claim that the first sale of the goods

9  was not authorized.  That would be a theory in which the

10 packaging didn't matter at all.

11          We respectfully submit, Your Honor, that if the

12 plaintiffs think they have such a claim, they can file a

13 complaint that fairly puts that out tomorrow and we will move

14 to dismiss it and we will have a fair opportunity to contest

15 whether or not our companies by the trade secrets should be

16 placed at risk on the basis of what we would consider to be a

17 novel and -- we don't think there's any basis for them to

18 plead that in this case.  First point.

19          Second point.  For opposing counsel to say that the

20 plaintiff has no competitive advantage to be gained from

21 seeking this information, the complaint is replete with

22 allegations that Costco is an unauthorized distributor and

23 they only sell to upscale stores like Neiman Marcus and

24 Bloomingdale's.

25          This case is not about lost profits on 864 units of

30

1   lipstick.  Come on.  This case is about trying to stop the

2   allegedly luxury product YSL from being in Costco stores no

3   matter what the packaging of it is.  So there's no doubt that

4   this discovery is being sought precisely because the plaintiff

5   has a -- plaintiff considers it has a vital commercial

6   interest in finding out this information and there's no

7   possible way with the best of face [ph.] on the part of

8   opposing counsel or in-house counsel in France, who aren't

9   even members of the Bar, that they could --

10          THE COURT:  Well, let me ask you this question.  It

11  seems to me that the initial -- there are two possibilities

12  with respect to the initial sale of the cosmetics that wound

13  up on Costco' shelves.  If the initial sale was authorized,

14  they already know who the seller is and there's no

15  infringement.  Agreed?

16          MR. DABNEY:  Well, no.  They would say that the

17  packaging is deceptive.  That's what we thought.

18          THE COURT:  Well --

19          MR. DABNEY:  They say that if the -- that's what we

20  thought this case was about.  These are genuine goods and they

21  say, well, someone looking at this would think they're getting

22  two items, instead of one, or the packaging doesn't give

23  adequate notice that it's repackaged.  It's repackaging,

24  repackaging, repackage.  So, Your Honor, they would say in

25  this case they have the same claim against Costco, even if the

31

1    first sale were authorized.  That's the whole point.

2          Whether the first sale was authorized or not had no

3    bearing on the claim that they put in this case.  This is a

4    totally new theory in which they say, well, the packaging

5    doesn't matter.  We might -- there was no reason for us even

6    to plead anything about the packaging because the first sale

7    was not authorized.

8          So I would respectfully disagree.  This case would

9    say even if the first sale was authorized, they have the same

10   claim.

11         THE COURT:  All right.

12         MR. EDERER:  Your Honor, could I just mention one

13   thing because I forgot to --

14         THE COURT:  No.

15         MR. EDERER:  No?  Okay.

16         THE COURT:  All right.  Well, with respect to the

17   discoverability of supplier information, it seems to me that

18   this -- that the discoverability -- that the supplier

19   information here is discoverable.  I respectfully disagree

20   with Mr. Dabney's reading of the amended complaint.  It's not

21   a model of clarity, but I think that the para -- particularly

22   paragraph 18 of the amended complaint can fairly be read to

23   include a claim that the sale of the cosmetics that wound up

24   on Costco's shelves was not authorized and that the sale may

25   constitute trademark infringement under the theor -- under the

1  tests described by Judge Haight in the <u>Ryan</u> case.

2          As I understand trademark law, if the initial sale

3  was not authorized by the trademark owner and the trademark

4  owner did not have the ability to control, the quality of the

5  product that the sale by Costco may well constitute trademark

6  infringement.

7          It seems to me supplier information is relevant

8  for -- to a determination of whether or not the product was

9  introduced into commerce, whether or not the sale was with --

10  was with the trademark owner's authorization.  So it seems to

11  me the supplier information is relevant.  And I say -- as I

12  said before, the amended complaint may not be a model of

13  clarity, but I think fairly read the reference to unauthorized

14  products, the reference to unauthorized channels of

15  distribution, it is fairly -- it can fairly be read to

16  incorporate the theory that the initial sale was not

17  authorized.  So I think the discovery is appropriate and I am

18  going to direct that the supplier information be disclosed.

19          The remaining issues, I guess, are who gets to see

20  the supplier information.  Let me come back to Mister -- I'm

21  not sure I understand why Yves Saint Laurent's in-house

22  counsel needs to see the supplier information.  I mean,

23  presumably Yves Saint Laurent can provide it to counsel with a

24  list of authorized sellers and by comparing whatever

25  information you get in discovery from a list of authorized

33

1  sellers why isn't that sufficient?

2          MR. EDERER:  Well, Your Honor, there's a couple

3  problems here because -- well, you may be right, actually.

4  Let me think about that for a second.  If they are buying the

5  goods from somewhere down the chain, not from the first party

6  that puts it into the stream of commerce --

7          THE COURT:  Um-hum.

8          MR. EDERER:  -- then I guess that party would not

9  show up on our list.  I guess one of the -- I guess the issue

10 is whether -- how were we supposed to determine from their

11 immediate supplier if they're second or third down the chain

12 whether the first sale in the stream of commerce was

13 authorized.  We -- in other words, we were --

14         THE COURT:  No, I understand that problem and that

15 problem is not -- is a real one, but I'm not sure how your in-

16 house counsel is in a better position to resolve that problem

17 than you are.

18         MR. EDERER:  You may be right about that.  It's just

19 that --

20         THE COURT:  I'm not sure what your in-house counsel

21 adds to the equation in that situation.

22         MR. EDERER:  You may be right about that, and I

23 think I would concede that if I could get a complete list, and

24 I'm assuming I can.  I have not discussed that with them.  If

25 I can get a complete list that makes sense to make then I will

1  be able to compare the information that they provide with the

2  list and see if the parties match up.

3        If there's any confusion about that, if a party goes

4  under two or three different names I may not necessarily be

5  able to tell that.  But I'm also saying that that may not be

6  dispositive of the issue because if they're buying from the

7  second or third party down the chain, the first sale could

8  still be unauthorized --

9        THE COURT:  Yeah.

10       MR. EDERER:  -- and we wouldn't necessarily know --

11       THE COURT:  Yeah.  No, I understand that.  But

12 again, my question comes back to what does -- what does the

13 in-house counsel have it's going to add?

14       MR. EDERER:  Perhaps nothing unless I need

15 clarification, Your Honor.

16       THE COURT:  Um-hum.

17       MR. EDERER:  And in that case, perhaps I would come

18 back to you and indicate to you that I may need to show

19 something to somebody in order to clarify that -- the issue of

20 who we're really talking about.

21       MR. DABNEY:  Your Honor, may I raise a couple of

22 questions in light of what's been stated here this morning?

23       THE COURT:  As long as you're not attempting to

24 reargue my decision.

25       MR. DABNEY:  I'd like to -- with regard to the

35

1  exchange that's just occurred, if I would -- I would

2  respectfully suggest a couple of things.

3          First of all, I have serious questions whether as a

4  practical matter it will be possible to withhold any supplier

5  information given over to Mr. Ederer from disclosure to the

6  world in effect because subpoenas are public and to the extent

7  that this is the subject of a notice of deposition or a

8  subpoena I can think of no practical way to prevent the

9  information from finding its way to the plaintiff.

10         Secondly is as Mr. Ederer's comment I'd just point

11 out, I believe the facts to be correct --

12         THE COURT:  Well, subpoenas are not filed.  I mean,

13 discovery material is not filed, so even if Mr. Ederer

14 subpoenaed somebody, the only people who would know about the

15 subpoena would be Mr. Ederer, the entity or person subpoenaed

16 and you.  Discovery material is not filed, so even if

17 somebody -- even if -- I don't know Cosmetics Daily sends a

18 report to the courthouse every day to scan the filings,

19 there's going to be nothing filed.

20         MR. DABNEY:  I would point out secondly that it's my

21 understanding that these plaintiffs are long-time clients of

22 Mr. Ederer.  His scope of representation to the plaintiff

23 includes the so called unauthorized distribution of goods and

24 I just am pointing out that I don't see how it is -- well, I

25 don't want to reargue that point.

36

1              The other point I would respectfully say since as

2   far as the defendant is concerned, there's not a word in the

3   complaint on this.  I would respectfully ask the plaintiff to

4   say whether as we sit here today it has any knowledge of any

5   unauthorized first sale that occurred at any point in the last

6   two years anywhere in the world, because we have no knowledge

7   of any of this.  It's not alleged in the complaint.  The

8   complaint doesn't say at such and such a time there was an

9   unauthorized first sale or we have reason to believe --

10              THE COURT:  Well, I mean, I think that's a discovery

11   request maybe you want to serve on Yves Saint Laurent.

12              MR. DABNEY:  There was -- this is why coming to --

13              THE COURT:  No, I mean, to -- there are certain

14   practical limitations.  I mean, to expect -- you know, to ask

15   counsel -- I mean, we don't have Yves Saint Laurent here to

16   ask counsel about what his client may know about transactions

17   on a worldwide basis, I mean, to expect any counsel to be able

18   to answer that question, I think, is not realistic.

19              MR. DABNEY:  As I understand Your Honor's ruling,

20   that was supposedly pleading in the complaint in this case.

21   We had no idea.  So if it really was --

22              THE COURT:  Well, that --

23              MR. DABNEY:  -- counsel's intent --

24              THE COURT:  That was not the question you proposed

25   to Mr. Ederer.

1          MR. DABNEY:  Okay.  Well, I guess I'm just saying I

2    believe that --

3          THE COURT:  You proposed a much broader question.

4          MR. DABNEY:  I -- okay, well, if there was some

5    event that the complaint was supposed to put us on notice of

6    and has not been the subject of any pretrial proceedings in

7    this case up until now, which would be the predicate of the

8    discovery that Your Honor is ruling, I guess I would like to

9    have it stated right here and now.

10          I mean, there's a theory that the goods were stolen

11    or that, you know, there was some rogue, I think I heard --

12          THE COURT:  Well, if you want to take discovery on

13    it, take discovery on it.

14          MR. DABNEY:  But presumably there was a Rule 11

15    basis for this allegation.  Your Honor says the complaint can

16    fairly be read to say -- I'm just saying it poses enormous --

17    I'm just trying to make a record that shows that we believe

18    that not only is the complaint not pleaded, but that if the

19    litigation is now into morph into a litigation over an event

20    that may have occurred, it -- we don't even know what we're

21    looking for.

22          But what's -- what I believe, you know, one outcome

23    of this could be is that the trade secret information if, you

24    know, objections are all overruled and so forth, we get to the

25    end of this and then we find out that there was no

38

1    unauthorized first sale because they never had any basis for

2    believing it and there was no unauthorized first sale,

3    certainly nothing that we had anything -- then where are we?

4            They don't --

5            THE COURT:  I don't understand --

6            MR. DABNEY:  They don't even allege --

7            THE COURT:  I mean, if you get to the end of the

8    road and plaintiffs don't prevail --

9            MR. DABNEY:  No, they don't even say that they --

10           THE COURT:  -- you'll make your application for

11   costs and/or --

12           MR. DABNEY:  -- know --

13           THE COURT:  -- attorney's fees and go on to the next

14   case.  I don't --

15           MR. DABNEY:  The plaintiff has --

16           THE COURT:  -- understand what you're asking.

17           MR. DABNEY:  What we have here is -- all right, I

18   won't continue rearguing the point.  I would just respectfully

19   try to make a record that we -- I see no --

20           THE COURT:  The only thing I do where both sides

21   leave happy are weddings, so I understand your -- you disagree

22   with my decision and you're free to do that and you're free to

23   file objections and so be it, but --

24           MR. DABNEY:  Well, we --

25           THE COURT:  I'm not sure where we're going.

39

1          MR. DABNEY:  Well, Your Honor had raised the

2  possibility that perhaps disclosure to outside counsel only

3  would mitigate the harm to Costco and I'm trying to suggest

4  that as a practical matter there's almost no point.  I mean,

5  once that happens, the case will be as all -- as a practical

6  matter over.  This plaintiff doesn't go -- the case will

7  basically be over.

8          THE COURT:  I'm not sure I understand what your

9  application is.  I'm not sure I understand what you want me to

10  do.

11          MR. DABNEY:  Well, I believe an aspect of the

12  plaintiff's application had to do with who all gets this

13  information and I guess that was --

14          THE COURT:  Right.

15          MR. DABNEY:  -- the part that Your Honor's --

16          THE COURT:  And the most restrictive limitation I

17  can think of is limiting it to outside counsel only and I'm

18  not sure I'm -- maybe I'm -- maybe I'm having a bad day,

19  Mr. Dabney.  I'm not sure I understand what you want me to do

20  here.

21          MR. DABNEY:  Well --

22          THE COURT:  Short of reversing the ruling I just

23  made.

24          MR. DABNEY:  Yes.  Well, I would suggest to Your

25  Honor certainly having it in the hands of outside counsel is

40

1  slightly less damaging, I suppose, than having it in the hands

2  of other agents of the plaintiff, so to the extent that that

3  is Your Honor's ruling that would be something that we would

4  appreciate.

5        THE COURT:  Oh.  All right.  All right.  Well, at

6  this point I'm going to direct it, then, that the supplier

7  information be produced, that it be produced to outside

8  counsel only.  If there's some new evidence that suggests that

9  some other limitation on -- that either that limitation should

10  be relaxed or that there should be some other limitation on

11  who gets the information, I'm happy to consider a further

12  application in the future.

13        With respect to the protective order that was

14  attached to the August 30 letter from Mr. Ederer, is there --

15  there's no protective order currently in place, is there?

16        MR. EDERER:  No, Your Honor, there's no protective

17  order signed or in place.

18        THE COURT:  Yeah.  I mean, is there an objection to

19  a particular provision of the proposed protective order

20  attached to Mr. Ederer's August 30 letter?

21        MR. DABNEY:  Yes.  It provides for the wholesale

22  disclosure of information to in-house counsel in France who

23  are not members of the Bar and basically is contrary to the

24  restriction Your Honor just imposed regarding this --

25        THE COURT:  Oh, well, apart from the supplier

41

1   information --

2   　　　　MR. DABNEY:  Yeah, it doesn't have an "outside

3   attorney's only" provision in at all.

4   　　　　THE COURT:  All right.  Apart from the supplier

5   information is there information in the case that should be

6   outside counsel only?

7   　　　　MR. DABNEY:  I mean, just the usual financial

8   information on both sides.  I believe both sides want that

9   restricted to outside counsel only.

10  　　　　THE COURT:  Well, let me ask Mr. Ederer this

11  question.  I mean, is there an objection to a protective order

12  I guess which would have three layers of protection, outside

13  counsel only, attorneys only, and confidential?

14  　　　　MR. EDERER:  No, Your Honor.  So long as the outside

15  counsel only is limited to what we just talked about.  I've

16  been told that they have no problem showing the materials as

17  previously disclosed with all the redactions and everything to

18  outside attorneys.  It's the supplier information -- to inside

19  attorneys I should say.  It's the supplier information that

20  they wanted to restrict to outside attorneys, so I don't see

21  any reason why I can't take the materials they've already

22  disclosed, which have all these redactions on them and show

23  them to in-house counsel at least and in turn with respect to

24  things that are designated confidential we've actually put it

25  that we can only show it to one businessperson as opposed to

42

1  everyone in the company.

2        We're trying to do this in a way because we have

3  information that we don't want to be spread around Costco

4  either.  But I've never said that there's one piece of

5  information that I want -- that from our production that I

6  want only Mr. Dabney to see.  And I think that the outside

7  counsel only tier should only relate to the supplier

8  information that we just talked about.

9        THE COURT:  All right.  All right.

10       Well, look.  Let me -- why don't you do this?  Why

11  don't you submit a revised protective order that has another

12  layer of protection outside counsel only and I will sign such

13  an order?  As to what gets designa -- I mean, not -- I don't

14  know exactly what's been designated here, but just a general

15  observation both from my time and practice in my time on the

16  bench is that attorneys -- some attorneys and I don't know

17  about -- I'm not making any accusations with respect to any

18  particular designation here, but many attorneys frequently

19  over designate material as confidential.  Probably the high

20  point or low point, depending on your point of view as I was

21  involved in one litigation where someone designated a

22  resignation statement that was filed with the SEC as

23  confidential attorney's eyes only.  Go figure.

24       Counsel should be judicious in what they designate

25  as attorney's eyes only.  I mean, there really should be a

43

1  good-faith basis to what you designate.  Ultimately if there's

2  a challenge to a designation, a designating party bears the

3  burden of proof on that under Rule 26(c).  You know, without

4  having a specific document and specific argument in front of

5  me, I can't really say whether something is appropriately

6  designated or not, but counsel should use good judgment in

7  that and, you know, shouldn't delegate it to a paralegal with

8  mechanical tests.

9           All right.  I'm not sure what else I can say on

10  that.  All right.

11           MR. EDERER:  Well, Your Honor, just picking up on

12  that point, I would ask Mr. Dabney to reconsider some of the

13  designations that have been made.  I'm holding one piece of

14  paper in my hand that says, "From Charlene Foranda [Ph.]" --

15           THE COURT:  All right.  Well --

16           MR. EDERER:  -- "to Barry Nishamura [Ph.]."

17           THE COURT:  Well, that -- you know, you should do

18  that --

19           MR. EDERER:  And then everything else is crossed out

20  and --

21           THE COURT:  You should discuss that with him

22  offline --

23           MR. EDERER:  Okay.

24           THE COURT:  -- in the first instance, okay?  I mean,

25  I'm not --

44

1          MR. EDERER:  Sure.

2          THE COURT:  Just as I'm not sure you're in a

3   position to respond to the global question that he was -- that

4   Mr. Dabney was hypothesizing to be pulling out one page out of

5   a 500-page -- even out of a 500-page production I'm not sure

6   Mr. Dabney is in a position to fairly respond to that today.

7          MR. EDERER:  Okay.  Just as an example.

8          THE COURT:  All right.  With respect to the

9   scheduling, is there opposition to the request at extension?

10          MR. DABNEY:  Strenuous opposition.

11          THE COURT:  All right.  Maybe I overlooked this.

12   Mr. Dabney, is it in your letter?

13          MR. DABNEY:  Your Honor, the scheduling order, I did

14   not understand that the -- the request for rescheduling was

15   put to Judge Sand.  I had not understood that the request that

16   the trial schedule of Judge Sand had been referred to Your

17   Honor.

18          THE COURT:  Yeah.  No, he -- it's been referred to

19   general pretrial supervision.

20          MR. DABNEY:  The pretrial schedule --

21          THE COURT:  Which includes scheduling.  I'm happy to

22   hear you on the scheduling issue.

23          MR. DABNEY:  Okay.  Well, I would -- may I approach?

24          THE COURT:  Sure.

25          MR. DABNEY:  The pretrial schedule in this case was

1  stipulated to and so ordered by Judge Sand and the schedule in

2  this case, I can issue Your Honor was predicated upon the view

3  of the complaint that I -- certainly from Costco's point of

4  view was the view of the complaint that we take.  And

5  throughout this case we have not initiated discovery or done

6  anything to try to litigate the claim that has now been

7  identified in our view for the first time as a basis for

8  seeking the discovery.  It is certainly going to be our

9  intention with all respect to Your Honor to urge upon Judge

10  Sand that the existing trial schedule and scope of discovery

11  and trial in this case be what I think everybody understood it

12  was when this order was so ordered by Judge Sand, but I don't

13  believe that given that we have a stipulation here it's not a

14  court -- it was not an order that was just entered by the

15  Court.  It could just be revoked.

16       THE COURT:  All right.  I'm going to -- with respect

17  to scheduling, I'm going to confer with Judge Sand's chambers

18  and see what wants.  I mean, oftentimes judges refer things

19  for general pretrial supervision before any schedule is in

20  place.  And when it's referred for GPT before there's any

21  schedule, then it's fairly clear that the magistrate judge has

22  jurisdiction to do whatever is appropriate concerning

23  scheduling.

24       Sometimes when it's referred after a schedule is in

25  place sometimes the district judge doesn't intend the

46

1  magistrate judge to tinker with the schedule notwithstanding

2  the technical scope of the reference.  I think probably what

3  makes the most sense is for me to confer with Judge Sand's

4  chambers and see what his pleasure is with respect to

5  scheduling and so I'm going to reserve on that.  Okay?  All

6  right.

7          I think those are all the issues in the

8  correspondence.  Have I overlooked anything from your point of

9  view, Mr. Ederer?

10          MR. EDERER:  No, Your Honor.

11          THE COURT:  Okay.  Mr. Dabney?

12          MR. DABNEY:  No, Your Honor.  Will the Court be

13  issuing a written order?

14          THE COURT:  Yes, yes.

15          MR. DABNEY:  Okay.

16          THE COURT:  How long is it going to take you to

17  supply?  What kind of deadline?

18          MR. DABNEY:  Well, it is Costco's intention to file

19  Rule 72 objections and I would respectfully request in the

20  circumstances that we not be required to incur the harm until

21  the Rule 72 objections have been ruled on.

22          THE COURT:  All right.  Can you do that -- how much

23  time do you need to do that?

24          MR. DABNEY:  To do what, Your Honor?

25          THE COURT:  To file the objections?

1          MR. DABNEY:  Well, I think we would -- I mean, we

2    would -- once we get Your Honor's ruling, I --

3          THE COURT:  It's going to be a summary order saying

4    for the reasons stated on the record in open court their

5    motion to com -- the plaintiff's motion to compel production

6    and supply information is granted.

7          MR. DABNEY:  Okay.  I think we would --

8          THE COURT:  It's not going to have a legal

9    discussion.  It's not going to have an analysis beyond what's

10    already on the record.

11          MR. DABNEY:  Okay.

12          MR. EDERER:  Okay.

13          MR. DABNEY:  Were these proceedings taped or --

14          THE COURT:  There's a digital recorder --

15          MR. DABNEY:  Okay.

16          THE COURT:  -- that's been recording the

17    proceedings.  You can order a copy from Joel Bloom [Ph.].

18          MR. DABNEY:  Right.  So I mean, we'll order an

19    expedited transcript, but I think we will need our ten days in

20    order to get the briefing in.  We have --

21          THE COURT:  Well --

22          MR. DABNEY:  You know, we thought we were just going

23    to be discussing the premotion conference here this morning,

24    so --

25          THE COURT:  Well --

48

1          MR. DABNEY:  So we would --

2          THE COURT:  This is what -- can you make your

3  objections by a week from Monday, which would be October 1?

4          MR. DABNEY:  Your Honor, I am -- I have a meeting in

5  London on the 26th, a speaking engagement in Göteborg, Sweden,

6  on the 27th, and a second speaking engagement in Williamsburg,

7  Virginia, on Saturday, the 28th, so --

8          THE COURT:  Right, but what's Mr. Fried and --

9          MR. DABNEY:  I've got --

10          THE COURT:  -- Mr. Frank and Mr. Harris,

11  Mr. Shriver, and Mr. Jacobson doing?

12          MR. DABNEY:  Well, I think in fairness as the

13  partner in charge of the matter, I should have -- I mean,

14  given --

15          THE COURT:  No, look.  I'm happy to give you stay so

16  you have time to file your objections, but at the same time

17  the discovery schedule that's in place now is a fairly tight

18  schedule, so --

19          MR. DABNEY:  I would respectfully --

20          THE COURT:  You know, also I know you're not the

21  only person working on the case.

22          MR. DABNEY:  I respectfully request -- what is the

23  date today?  Today is the 21st?

24          THE COURT:  Today is the 21st.

25          MR. DABNEY:  And I think our ordinary time to file

49

 1  those would be basically two weeks from today.

 2        THE COURT:  Well, that's going to put you out to

 3  October 9 and then they have time to respond.

 4        MR. DABNEY:  I --

 5        THE COURT:  I'm trying to jam you up and say, you

 6  know, Monday or Tuesday, but at the same time you don't

 7  want -- you're opposed to an extension of discovery.  They're

 8  entitled to the discovery within a reasonable period of time

 9  to make use to it.  You're entitled to have your objections

10  adjudicated.  You know, I'm not trying to create an impossible

11  schedule, but, you know, two weeks here --

12        MR. DABNEY:  I guess if I could -- I mean, I could

13  get -- file it on a Thursday instead of a Friday or Wednesday?

14  I just -- it's going to be very difficult for me just given my

15  travel schedule to be able to file it on that Monday.  I will

16  have -- I have one business day in the office between now and

17  that day.

18        THE COURT:  All right.  Look, I will stay -- I will

19  stay production of the supplier information provided -- until

20  there's a determination by Judge Sand provided that you file

21  your objections by Tuesday, October 2.  Okay?

22        MR. DABNEY:  That's my birthday.

23        THE COURT:  Happy birthday.

24        MR. DABNEY:  Thank you, Your Honor.

25        THE COURT:  Okay.

50

1          MR. DABNEY:  I hate to work on my birthday, so --

2          THE COURT:  All right.

3          MR. EDERER:  I'm actually working next week.

4          THE COURT:  This goes back to Mr. Dabney, okay?

5          MR. DABNEY:  Thank you, all.

6                          * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

51

1                          * * * * * *

2          I certify that the foregoing is a court transcript

3     from an electronic sound recording of the proceedings in the

4     above-entitled matter.

5

6                          _____

7                                    Ruth Ann Hager

8     Dated:   September 23, 2007

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25