UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| YVES SAINT LAURENT PARFUMS, S.A. and YSL BEUTÉ INC., <br><br> Plaintiffs, <br><br> v. <br><br> COSTCO WHOLESALE CORPORATION, QUALITY KINGS DISTRIBUTORS, INC. and J&H COSMETICS LTD., <br><br> Defendants. | 07 Civ. 3214 (LBS) (HP) <br><br> **MEMORANDUM & ORDER** |
| QUALITY KING FRAGRANCE, INC. and QUALITY KING DISTRIBUTORS, INC., <br><br> Third-Party Plaintiffs, <br><br> v. <br><br> J&H COSMETICS, LTD. and GERALD SCHMELTZER, <br><br> Third-Party Defendants. | |

SAND, J.

  This case began as a trademark infringement action, but soon splintered into a multitude of subsidiary claims. In 2007, Yves Saint Laurent Parfums S.A. and YSL Beauté Inc. (collectively, "YSL") sued Costco Wholesale Corporation ("Costco") for selling counterfeit Opium brand perfume, the rights to which YSL owns exclusively. Both YSL and Costco then sued Quality King Fragrance, Inc. and Quality King Distributors, Inc. (collectively, "QKF"), which had sold the counterfeit Opium to Costco. In 2008, YSL, Costco, and QKF settled. Maintaining that it had "unwittingly" sold the counterfeit Opium, QKF filed suit against J&H Cosmetics Ltd. ("J&H") and

1

Gerald Schmeltzer—J&H's sole officer, shareholder, and director—claiming that J&H, its erstwhile supplier, was the source of the counterfeit batch.

Having asserted cross-claims against J&H for breach of contract and breach of warranty, and against J&H and Schmeltzer for unfair competition, contribution, and indemnity, QKF now moves for summary judgment, seeking $707,833 plus interest in damages. The Court, however, finds that genuine issues of material facts exist regarding the chain of custody of the counterfeit perfume. QKF's motion is therefore denied.

## I.   Standard of Review

Summary judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "[T]he burden is upon the moving party to demonstrate that no genuine issue of respected any material fact exists." *Gallo v. Predential Residential Servs., Ltd. P'Ship*, 22 F.3d 1219, 1223 (2d Cir. 1994). A material fact is one that might affect the outcome of a suit under governing law. *Kinsella v. Rumsfeld*, 320 F.3d 309, 311 (2d Cir. 2003). A genuine issue exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Libery Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A non-moving party can defeat a properly asserted summary judgment motion by demonstrating the existence of a material issue of fact necessitating a trial on the merits. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). While all ambiguities must be resolved and all inferences drawn in favor of the party against whom summary judgment is sought, *Anderson*, 477 U.S. at 249, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indust. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

We emphasize that the "function of the district court in considering the motion for summary judgment is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537 (2d Cir. 2010).

## II. Discussion

While J&H raises numerous objections to QKF's motion for summary judgment, everything hinges on whether or not QKF's claim that it has traced the counterfeit Opium to J&H is actually undisputed.

QKF alleges that "[i]t is undisputed that the 5JAC Opium[, the counterfeit batch,] that QKF received from J&H was non-genuine." Quality Kings Fragrance, Inc.'s Mem. Supp. Mot. Partial Summ. J. ("QKF Brief") 10. QKF also argues, based on expert testing it commissioned, that only product supplied by J&H, and none of its other suppliers, was counterfeit. QKF Brief 10-12. Defendants disagree, arguing for the existence of "genuine issues of fact relative to whether J&H supplied the products at issue in this case." Mem. Opp'n Quality King Fragrance, Inc. Mot. Partial Summ. J ("J&H Brief") 6. That the parties disagree, however, does not mean that the evidence reveals a genuine issue of material fact requiring a jury trial. *See Anderson*, 477 U.S. at 252.

The parties seem to agree that in January, April, and May 2007 QKF placed orders with J&H for 2400, 2600, and 3600 1.6 ounce bottles of Opium. Oddo Decl. Ex. A. Corresponding to these orders, J&H delivered 1627 bottles in March, 2600 bottles in May, and 2912 bottles in July. Oddo Decl. Ex. B. But the parties disagree about what happened next.

QKF claims that, on May 14, 2600 bottles were delivered as scheduled and were stored in its warehouse in bin # 27-057-2. QKF Brief 14; Oddo Decl. Ex. C. In addition, QKF claims that this was the first time that Opium had been stored in bin # 27-057-2 since at least 1999. QKF

3

Brief 14; Oddo Decl. Ex. D. Based on two invoices, both dated June 29, 2007, QKF claims that it sold 2500 bottles of Opium to Costco. Quality Kings Fragrance, Inc.'s Reply Mem. Further Supp. Mot. Partial Summ. J. ("QKF Reply Brief") 4; Oddo Decl. Ex. E. Of these 2500 bottles, 2444 had been stored in bin # 27-057-2. *Id.* In other words, with respect to 2444 bottles of Opium—which QKF claims contained counterfeit product—QKF argues that it has established a chain of distribution demonstrating that the counterfeit product is traceable to J&H.

J&H disputes that QKF's documents "show a clear chain of distribution from J&H to QKF, to Costco." J&H Brief 6. First, J&H disputes that the bottles that were sold to Costco came from bin # 27-057-2, because the duplicate invoices (Oddo Decl. Ex. E) have—or so J&H argues—"been altered with handwriting." J&H Brief 7. We reject this claim as wholly unsupported by the evidence; nothing whatsoever suggests any handwritten alteration. Second, J&H argues that QKF sent samples of the supposedly counterfeit product to Costco before receiving the May shipment, and that, therefore, the samples sent to Costco—i.e., the counterfeit product—could not have been supplied by J&H. J&H Brief 8. But J&H delivered a prior shipment of Opium to QKF in March, Oddo Decl. Ex. B., and J&H has not explained (or even tried to explain) why the samples could not have been drawn from that earlier delivery.

J&H has, however, raised more substantial objections with respect to the possible commingling of the samples and the existence of other, untested and unaccounted for, samples from suppliers other than J&H. J&H argues, first, that 104 bottles of Opium placed in bin # 27-057-2 came from another supplier; and second, that 56 bottles of the 2500 that QKF shipped to Costco came from bin # 99-001-1, which QKF has not traced back to J&H. The inference, then, is that the 104 bottles from the other supplier and/or the 56 bottles from bin # 99-001-1 may have been the true source of the counterfeit Opium. J&H also points to the fact that QKF had "eleven (11) additional suppliers of ... Opium ... from March 1, 2006 through November 30,

2007, eight (8) of which QKF failed and refused to produce any samples or documentation for." J&H Brief 8. Therefore, J&H argues, QKF's contention that only J&H's product was counterfeit does not survive scrutiny, since QKF has not, via testing, ruled out all other possible sources.

QKF concedes the factual bases underlying these points, but argues that they are irrelevant. QKF Reply Brief 5. With respect to the 104 samples, QKF claims that they came from a different supplier, "supplier 'B,' whose inventory was tested and and found genuine." *Id.* With respect to the 56 bottles, which came from bin # 99-001-1, QKF argues that "[s]ince the counterfeit Opium from Costco's shelves is counterfeit in the *exact same way* as the Opium QKF received from defendants—which never left QKF's warehouse—it strains credulity to argue that any of the counterfeit samples could have come from another supplier." *Id.* (emphasis in original). Finally, with respect to the other eight suppliers, QKF argues that it didn't have any merchandise from those suppliers in it possession, and so could not produce them for testing. *Id.* at 10.

We reiterate that it is not our job to weigh and evaluate the evidence, only to decide on the existence of any genuine and disputed issues of fact. While we note the extensive evidence that QKF has assembled in its favor and J&H's puzzling failure to conduct any depositions or hire its own experts, it is not possible to conclude, on the papers, that QKF is entitled to judgment as a matter of law. *See Vt. Teddy Bear Co. v. 1-800 BEARGRAM Co.*, 373 F.3d 241, 244 (2d Cir. 2004). Given the necessarily limited sample size tested by QFK's expert, the potential for commingling, and the existence of untested product supplied by the eight additional suppliers, there remains more than mere "metaphysical doubt," *Matsushita Elec. Indust.*, 475 U.S. at 586, that J&H was the supplier of counterfeit product.

### III. Conclusion

For the foregoing reasons, QKF's motion for summary judgment is *denied*. The court is aware that prior settlement negotiations have been unsuccessful. Parties are directed to submit a

pretrial order within six weeks hereof advising the Court when they will be ready for trial, unless, that is, parties would be amenable to some other form of dispute resolution.

**SO ORDERED.**

May 2, 2012
New York, N.Y.

_____
U.S.D.J.

6